IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FEB 2 5 2013

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Criminal No. 13-30040-WDS |
| TROY DYE, | ) |
| Defendant. | ) |

## STIPULATION OF FACT

The United States of America and Defendant stipulate that the following is true:

### Universal Marketing Solutions and Creative Vacation Solutions

1.  Creative Vacation Solutions was a Florida Corporation based in Palm Beach County, Florida and formed in 2008. CVS had several sales offices located in central Florida including offices at West Palm Beach, Belvedere, Boca Raton, Okeechobee, Green Acres and Lake Worth. Some of these offices resembled franchise operations in that they were owned and operated by others, but used the same business name, the same sales pitches and collected money through common credit card merchant accounts. CVS was the successor of Universal Marketing Solutions (UMS). Sales at UMS and CVS were conducted in the same manner.

2.  Defendant **TROY DYE** worked as a sales representative for CVS during 2009. During his employment at CVS, **DYE** worked primarily in the office known as Lake Worth I.

3.  UMS and CVS engaged in a scam intended to deceive consumers into believing that these timeshare resale companies had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest. Telemarketers typically provided a specific closing date sixty to ninety days out and told clients that they would have to pre-pay closing related expenses of up to

1

several thousand dollars. Telemarketers then processed charges against the consumers' credit cards and pocketed the money.

4. The established, proven and highly successful sales pitch that was used by UMS and CVS telemarketers contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

    A. UMS and CVS agents falsely represented that the company had received an offer on the customer's time share.

    B. UMS and CVS agents falsely represented that a closing was scheduled on the property, often on a specific date thirty to ninety days hence.

    C. UMS and CVS agents falsely represented that the fees were for deed and title searches, maintenance profiles, deed preparation, title transfer and for similar expenses.

5. In general, the closing date given to customers was made up by the telemarketer. The policy of UMS and CVS was that the made up closing date needed to be at least 60 to 90 days from the date of the call. The purpose of the delayed closing date was to postpone when customers would call their credit card companies or banks to complain that they had been defrauded, an inevitable result from their supposed "closing" dates having come and gone without the client receiving the sales proceeds check they had been promised. Delaying that inevitable reporting by the client was important to the success of the scheme, since customer complaints would almost certainly result in charge backs against the company's merchant account and thus jeopardize the ability of the company to process bank card transactions and get paid.

6. The representations made in the sales pitch used by UMS and CVS were false and fraudulent in that the offers on the consumer's property were a fantasy, the closing dates were totally make believe, and the purported purpose of the fees a pure invention by the telemarketer.

2

The fees were not being used for closing costs, but were being purloined to enrich the telemarketers and their bosses and pay for the continuing expenses associated with the scam. Only a relatively small amount was going to the cost of listing the property on CVS's website, if indeed the consumer's property was even listed there.

7. Despite collecting millions of dollars from consumers for timeshare resale services, UMS and CVS were not instrumental in selling a single timeshare. While occasionally desperate timeshare owners expressed interest in abandoning their timeshare interest because of recurring annual fees, and one of the principals of UMS and CVS personally would purchase timeshare units at distressed fire sale prices, there were substantially no sales at or anywhere near the full asking price of the seller. UMS and CVS made no substantial effort to either market or advertise any customer's timeshare interest other than a simple listing on a website which was made at relatively nominal expense. UMS and CVS made little effort to promote the website and a listing on the website was of little practical value to its customers.

8. The sales practices of UMS and CVS were false and misleading and was a business permeated with fraud in an industry pervaded by deceit.

9. Defendant utilized sales scripts that in the circumstances in which they were used created an appearance which was false and deceptive and calculated to induce a false belief as to the true facts.

10. In connection with the transactions described in the Indictment, Defendant engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest advantage over hundreds of victims located in the Southern District of Illinois and elsewhere throughout the United States, and Canada.

11. In furtherance of the scheme, Defendant caused contracts and other documents to be transmitted by U.S. Mail or by interstate commercial carrier.

12. In furtherance of the scheme, Defendant caused interstate telephone calls to be made to the Southern District of Illinois.

13. DYE was responsible for approximately 62 sales at UMS and CVS aggregating $123,408.24.

## International Resort Solutions LLC

14. International Resort Solutions LLC ("IRS") was a Florida limited liability company based in Palm Beach County, Florida and formed in 2009. The main office of IRS was initially located in Lake Worth, Florida, and then later moved to West Palm Beach, Florida. IRS solicited clients through at least six separate telemarketing sales offices, each located in Palm Beach County, Florida.

15. Defendant **TROY DYE** worked as a telemarketer for IRS during 2009.

16. IRS engaged in a scam intended to deceive consumers into believing that the IRS timeshare resale company had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest. Telemarketers would cold call timeshare owners throughout the United States and Canada an attempt to induce them to pay up-front fees for purported timeshare marketing and sales services. To that end, telemarketers, including the defendant, routinely made false and fraudulent representations and promises to the timeshare owners about IRS's services, including falsely representing that IRS had closings scheduled for the sale of the owner's unit and that IRS would actively market timeshare units to potential buyers. Telemarketers would then tell timeshare owners that they would have to pre-pay purported closing related expenses of between

4

$999 and $2,996. Telemarketers then processed charges against the consumers' credit cards and pocketed the money.

17. The established, proven and highly successful sales pitch that was used by IRS telemarketers contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

    A. IRS telemarketers falsely represented that the company had buyers for the customer's time share.

    B. IRS telemarketers falsely represented that a closing was scheduled on the property.

    C. IRS telemarketers falsely represented that the fees were for closing, marketing, and/or appraisal costs associated with the purported sale of timeshare units.

18. IRS did not use the advanced feeds to locate potential buyers or to pay closing, marketing, or appraisal fees, as represented to timeshare owners.

19. In an attempt to conceal the fact that the telemarketers had made numerous false and fraudulent representations to the timeshare owners, IRS sent the timeshare owners, via Federal Express, sanitized sales and marketing contracts. The contracts did not include any of the false and fraudulent statements made by the telemarketers over the phones. Timeshare owners were directed to sign and return these contracts to IRS. The written contracts were retained by IRS purportedly as proof that IRS never made any fraudulent representations to the timeshare owners.

20. The sales practices of IRS were false and misleading and was a business permeated with fraud in an industry pervaded by deceit.

21. In furtherance of the scheme, Defendant caused contracts and other documents to be transmitted by U.S. Mail or by interstate commercial carrier.

22. In furtherance of the scheme, Defendant caused interstate telephone calls to be made.

23. ~~DYE was responsible for approximately 70 sales at IRS aggregating $232,000.~~ *[struck through, initialed NDS TD]*

_____
TROY DYE
Defendant

_____
ROBERT HERMAN
Attorney for Defendant

STEPHEN R. WIGGINTON
United States Attorney

_____
NATHAN D. STUMP
Assistant United States Attorney